# CASES

ADJUDGED IN

# THE COURT OF CHANCERY

## OF THE STATE OF NEW JERSEY.

### OCTOBER TERM, 1870.

---

### FIDLER *vs.* HIGGINS and others.

1. The surplus of the proceeds of lands of an infant sold by order of the Orphans Court to pay debts of her father, from whom she inherited them, remains real estate, and at her death must descend as such.

2. The descent of real estate in New Jersey is governed by the rules of the common law, so far as these rules have not been changed by statute.

3. The common law rule, that among collateral relatives, lineal descendants shall represent their ancestor *ad infinitum*, has not been altered, either expressly or by implication, by the statutes of New Jersey regulating descents.

4. The degrees of consanguinity mentioned in the sixth section of the statute of descents, must be ascertained by the common law rule as to descent of real estate, allowing representation among collaterals, which, like the rule prohibiting ascents, has never been changed. The rule of the Civil law for computing next of kin, has never been adopted in this state, and it is not required by any implication from the provision of this section. And the " equal parts " in this section must be held to mean equal *per stirpes*, as the like words, " equal portions," in the statute of distributions are settled to mean.

5. By such representation, cousins and more remote descendants of deceased uncles of an intestate are in the same degree as living uncles, and inherit, by representation, the share of such deceased uncle.

---

Fidler *v.* Higgins.

The complainant was guardian of Mary Anna Higgins, who died under age, January 23d, 1867. He, as her guardian, in her lifetime, had received a sum of money, which was the surplus of the proceeds of lands that had descended to her from her father, and been sold by an order of the Orphans Court of Hunterdon, for the payment of his debts. Part of these proceeds remain in the complainant's hands, the amount being adjudged by the Orphans Court on a settlement of his final account as guardian, after the death of his ward. The infant was never married; she left, at her death, no brother or sister of the whole or half blood, or issue, of such brother or sister, but left her mother, Elizabeth Fidler, William B. Higgins, a brother, and Catharine Gano, a sister of her father, and Lemuel M. Deats and Julia Deats, children of Rebecca Deats, a sister of her father, who had died in her lifetime, and left no other collateral relations on part of her father, of the same degree of consanguinity.

The surviving aunt and uncle of the infant, Mary Anna, claim that they are exclusively entitled to the amount which may remain in the hands of the guardian after the death of Elizabeth Fidler, as the heirs-at-law of Mary Anna; and Lemuel and Julia Deats claim that, as representatives of their mother, they are entitled to her share, or one-third of the amount, as co-heirs.

The bill is filed to settle this question, and the parties are all before the court. The defendant, William B. Higgins, having died after the commencement of this suit, his executor, George Higgins, has been made a party in his place.

The cause was argued upon exceptions filed by George Higgins to the master's report.

*Mr. J. N. Voorhees,* for exceptant.

Mary Anna Higgins died January 23d, 1867. The complainant was her guardian; and on the statement and settlement of his final account with the Orphans Court of Hunterdon county, there remained in his hands $1156.15,

to be disposed of according to law. This money was proceeds of sale of real estate of John Higgins, deceased, the father of Mary Anna, and descends as real estate. Mary Anna died without leaving lawful issue, brother or sister, or any lawful issue of any brother or sister, without leaving a father, but leaving a mother; consequently, under the fourth section of the statute regulating descents of real estate, *Nix. Dig.* (*4th ed.*) 236, the inheritance goes to the mother for life, and at her decease, then as directed by the sixth section of the same statute, which provides—"When any person shall die seized, &c., without, &c., and shall leave several persons, all of equal degree of consanguinity to the person so seized, the lands, &c., shall then descend and go to the said several persons of *equal degree of consanguinity* to the person so seized, as tenants in common, in equal parts, however remote, &c."

Mary Anna left her surviving William B. Higgins, (uncle), Catharine, wife of George Gano, (aunt), Lemuel M. Deats and Julia R. Deats, children of Rebecca, wife of Hiram Deats; Rebecca being an aunt to Mary Anna; Lemuel M. and Julia R. being cousins to Mary Anna.

The question, therefore, presented, is, do surviving uncles and aunts take, as a class, before, and in exclusion of surviving cousins?

In calculating the degrees of consanguinity by force of the sixth section, the rule of the Civil and not that of the common law, is to be used. *Taylor* v. *Bray*, 3 *Vroom* 182. This seems to have been a well considered case, and the Chief Justice, in pronouncing the opinion of the court, has reviewed the statutes relating to this subject, from 1780 to 1867, and on page 185, says, in reference to the sixth section of the act regulating descents: "And by a similar train of reasoning, we reach the further conclusion that the section in question not only bestows the estate on the class of relatives next to the person dying seized, but also gives it to a unit of such class, that is to say, for example, if a single uncle or aunt survives, he or she will inherit, rather than

cousins, the children of deceased uncles or aunts." And, in fact, the whole reasoning of that case seems to concede the point that in computing degrees of relationship we adopt the Civil law rule. This will appear from the concluding remarks of the opinion, page 191. He says: "I am aware that formerly there was some uncertainty on this subject, but the opinion of the profession appears to have become settled in favor of the method just indicated. Such method has received the approval of Chief Justice Green. *Nix. Dig.* 215. The opposite doctrine is attended with consequences which appear to forbid, imperatively, its adoption."

By the common law method of computation, the children of deceased uncles and aunts (being by force of this rule as near of kin as living aunts and uncles,) would be entitled to share the estate equally, *per capita.* Hence, in this case, if Rebecca were living, she would be entitled to one-third, but being dead, and leaving two children, it would follow, that as the statute directs that the estate must go to the said persons of equal degree of consanguinity, &c., *as tenants in common in equal parts,* the children of Rebecca must each have one-fourth, making for their share one-half of the whole estate, while if their mother had been living at decease of Mary Anna, she could only have received the one-third. Can this be the rule? By the statute they take as tenants in common in *equal parts,* and in this case, if Rebecca had twelve children, they would have taken twelve-fourteenths of the whole estate, because the law says they take "*as tenants in common in equal parts.*" *There is no provision for them to have their mother's share.* If they take, it is because they are of equal degree of consanguinity with William B. Higgins, and Catharine, wife of George Gano; and if that be so, then the estate must be divided in as many parts as there are persons of equal degree of consanguinity to the person dying seized, and each person so related takes an equal share. Sections two and five, and other sections of the same act, provide for such a contingency, (the child taking parent's share). And had the legis-

lature intended that cousins should take, when uncles and aunts were living, would there not have been some provision by which such cousins should have only taken their parent's share?

The master's report in this case seems to be founded upon the suggestion of the court, in the case of *Oberly* v. *Lerch*, 3 *C. E. Green* 346, affirmed by the Court of Appeals, 3 *C. E. Green* 575.

The question argued, and the only question argued in that case, referred to the status of surplus moneys arising from sale of lands by order of court to pay debts, whether such surplus moneys descended as realty or personalty; and no point was raised as to the right of Emma Baker (cousin) to a share of such moneys. On the cause being decided by the Court of Appeals, the same point, previously stated, and no other, was discussed. And the Chief Justice, who pronounced the opinion, adverts to the fact, that the contest is between the heirs-at-law on the one side, and the personal representatives of deceased. And again he says, page 581, in my opinion this point, (referring to surplus money, whether personalty or realty,) which is the only substantial one in the case, should be considered *res adjudicata*. Again: "these were the only points raised on the argument." No reference is made by him to his opinion previously given in *Taylor* v. *Bray*, and the status of Emma Baker, the cousin, does not seem to have been referred to and argued, but, by consent, she seems to have been considered an heir-at-law.

The question as to the right of Emma Baker in this case, not having been raised, and consequently not considered as a subject matter in controversy, it would seem that this case ought not to be considered as settling the law in regard to the rights of aunts or uncles, and cousins. The ambiguity or uncertainty as to the proper construction of the sixth section, having been expressly settled in the case of *Taylor* v. *Bray*, and settled, as the Chief Justice expresses it, in conformity with a former opinion of Chief Justice Green, and in conformity with the recognized sentiment of the pro-

fession, and also in favor of the doctrine which recognizes the natural right inherent in propinquity in blood, it should not now be disturbed. We therefore respectfully submit, that the children of Hiram Deats, should not receive any portion of the moneys in complainant's hands, but that the same should go to William B. Higgins and Catharine Gano.

*Mr. Bullock*, contra.

It is insisted, on behalf of William B. Higgins and Catharine Gano, that under the sixth section of the act directing the descent of real estates, uncles and aunts take, as a class, before and in exclusion of surviving cousins.

But they rely exclusively, and, as it seems to us, must rely exclusively, upon the *obiter dictum* of the Chief Justice, in the case of *Taylor* v. *Bray*, 3 *Vroom* 182, where the question, and the only question presented was, whether by force of the said sixth section of the statute of descents, a grandmother could take land of which her grandson died seized; in other words, whether the first rule of the common law, regulating the descent of lands, that the inheritance should never lineally ascend, had been abrogated in this state. The court held in that case, very decidedly, that that rule of the common law had not been repealed, but says that some other rules of the common law regulating the descent of lands, equally important, have been abrogated.

We think the case of *Oberly* v. *Lerch*, 3 *C. E. Green* 346, affirmed by the Court of Appeals, *Ibid.* 575, is on all fours with this case in every respect.

The estate of Emma Oberly consisted of the surplus proceeds of the sale of her father's lands, sold by order of the Orphans Court for the payment of his debts. Precisely the same as that of Mary Anna Higgins.

Emma Oberly died an infant, leaving Charles Oberly, John F. Oberly, and Robert Oberly, her paternal uncles, and Emma Baker, the daughter of her deceased paternal aunt, her only heirs-at-law, besides her mother, who inherited for life. Mary Anna Higgins died an infant, leaving William

B. Higgins, her paternal uncle, Catherine Gano, her paternal aunt, and Lemuel M. Deats and Julia R. Deats, children of her deceased paternal aunt, her only heirs-at-law, besides. her mother, who inherits for her life.

We insist, that as in that case, so in this, the estate in the hands of the guardian of Mary Anna Higgins, should be: invested for the use of her mother during life, and at her death, the principal be divided among the uncle, aunt, and cousins aforesaid.

The sixth section of the act directing the descent of real estates, by construction of which it is attempted to exclude Lemuel M. and Julia R. Deats, provides, that where any person shall die seized, &c., without leaving, &c., capable of inheriting by this act, &c., and shall leave several persons, all of equal degree of consanguinity to the person so seized, the said lands, &c., shall then descend and go to the said several persons of equal degree of consanguinity to the person so seized, as' tenants in common in equal parts, however remote from the person so seized the common degree of consanguinity may be, unless where such inheritance came. to the said person so seized, &c. *Nix. Dig.* (*4th ed.*) 236.

There can be no question but what Lemuel M. and Julia. R. Deats are entitled to share this estate with their uncle and aunt, if the degrees of consanguinity are reckoned by the rule of the common law.

The Constitution of this state, adopted July 2d, 1776, section 22d, provided that the common law of England should still remain in force until altered by *a future law of the legislature,* unless repugnant, &c.

The present Constitution of this state, article X, section 1, provides, that the common law now in force, not repugnant to this Constitution, shall remain in force until altered or repealed *by the legislature.*

In the case of *Den* v. *Jones and Searing,* 3 *Halst., p.* 345, Chief Justice Ewing says: "Nothing but the plain and imperious requisition of a *statute* ought to induce a de-

parture from the well known and safe rules of the common law."

We submit, that in ascertaining the collateral heir of the person last seized, the rule of the common law prevails in this state, having never been altered or repealed by statute. And we respectfully insist that in this case, the degrees of consanguinity are to be reckoned by the rule of the common law, and that Lemuel M. Deats, and Julia R. Deats, are entitled to share the estate with their uncle and aunt.

THE CHANCELLOR.

The money in the hands of the complainant, as guardian, being the surplus of the proceeds of lands of an infant, sold by order of the Orphans Court to pay debts of her father, from whom she inherited them, remains real estate, and at her death must descend as such. This was settled by the Court of Appeals in their affirmance of the decree of this court, in *Lerch* v. *Oberly*, 3 *C. E. Green* 575. It is admitted by all parties that the mother is entitled to the interest of this money for her life. The only question is, whether, by the statute of descents in New Jersey, cousins, the children of a deceased uncle or aunt, are entitled to inherit with uncles and aunts who survive the intestate, or whether such uncles and aunts are entitled to inherit exclusive of cousins, as not in equal degree of consanguinity, and not entitled to represent their deceased parent.

The question is one which has never been directly decided by the law courts of this state. There are dicta and supposed impressions of the bar of the state, against the right of cousins to inherit with uncles and aunts, and on the other hand, in the case of *Lerch* v. *Oberly*, it was expressly ruled in this court, that a cousin of Emma Oberly, the daughter of an aunt who had died before her, inherited equally with her surviving uncles; the decree was framed upon that ruling, and was afterwards affirmed in the Court of Appeals. The opinion in this court was not given inadvertently, but was one that had been formed upon a careful consideration

of the subject.  In the Court of Appeals the question seems not to have been brought to the notice of the court, and is not alluded to in the opinion delivered by the Chief Justice, and it was not in all probability considered by them.  This is rendered almost certain by the fact that in the opinion of the Chief Justice, in *Taylor* v. *Bray*, 3 *Vroom* 184, delivered a few months previously, there are dicta inconsistent with this view.

The whole question is, whether the statutes of descents have, directly or by implication, abolished and changed the established common law doctrine of representation among collaterals, and whether, in ascertaining the "degrees of consanguinity" mentioned in those statutes, we must adopt the Civil law method of computation of degrees of kindred adopted by the courts of England and of this country, in calculating who are "next of kindred" under the statute of distributions.

It is said that Chief Justice Green, in a case at Hunterdon circuit, of which there is no report except a note in Nixon's Digest, held that cousins could not inherit with uncles and aunts.  The opinion of that learned jurist, though at circuit, on a question which he had examined and considered, would have great weight with me, but I have been told by counsel present, that the question was not argued, and that the decision was made by a simple question to counsel, whether it had ever been heard of in this state, that cousins inherited with uncles.  I have no doubt that such opinion was entertained by many of the bar, who, if not called upon to investigate and examine the subject, would naturally conclude from the adoption of the Civil law rule, by the civil as well as the ecclesiastical courts, in ascertaining the next of kin under the statute of distributions, that it would be adopted as the rule under the statute of descents.  An opinion thus formed would, no doubt, be acted upon at the circuit.  But a mere ruling in one cause at the circuit in this manner, cannot be considered as settling the law.

In the case of *Taylor* v. *Bray*, above mentioned, the present Chief Justice, in some observations at the conclusion of his opinion, 3 *Vroom* 191, assumes that the degrees of consanguinity under our statute, should be reckoned by the rule of the Civil, and not of the common law. He states that formerly there was some uncertainty on this subject, but that the opinion of the profession *appears* to have become settled in favor of the Civil law method. This question was not involved in that case, and this view is no part of the decision of the case, and does not seem to have been considered by the court. The dicta of so able and learned a jurist are entitled to great regard, but they do not amount to a definite decision by that court, which, on a legal question, would control me sitting here. The question is by him regarded more as put at rest by the opinions of the bar, than by any definite application of rules of construction; and much reliance is placed upon the unreasonable consequences which are assumed to follow the other construction, consequences entitled to great consideration, if they were not obviated by the construction universally put upon like terms as to equal shares, when given to representatives by the statute of distributions. The question was not argued in that cause, and I can conceive that the argument, and consideration of the question, might change the views of the Chief Justice expressed in that opinion. And with the views I have formed and expressed on the question, I cannot regard this as such a settlement by a court of law as to control this court against its own views.

The common law of England, which is adopted in this state, especially as regards real estate, has certain clear and well settled rules or canons of descent, which, so far as not changed by statute, our courts have always recognized and adhered to. These canons have never been held to be repealed by doubtful words, but only by express words or necessary implication. Among these rules or canons is one, that inheritance shall lineally descend, but shall never ascend. A statute would repeal this rule, and where it

directed in certain cases that a father or mother of the decedent should inherit his lands, the rule was so far repealed. But when the statute directed that in certain cases the lands should go to persons in equal degree of consanguinity to the intestate, although a grandmother is, by any rule of reckoning, kindred in the second degree, and is included in the terms of the statute, yet it was held that this rule of the common law was not repealed by such an implication as this, but that as this provision could in many cases have effect without repealing that rule, it must be intended to have been made subject to that rule, and not in derogation of it. Such is undoubtedly the correct rule of interpretation where the statute does not in any other part indicate design to change the established rule. This is most clearly and logically shown in the opinion of the Supreme Court in the case of *Taylor* v. *Bray*, above referred to.

Another common law rule, or canon of descent, the fifth enumerated by Blackstone, is, that on failure of lineal issue the inheritance shall descend to the collateral relations of the blood of the first purchaser, subject to the rules that the lineal descendants shall represent their ancestor *ad infinitum*, and that the collateral heir shall be the next collateral kinsman. The canons of male preference and primogeniture, which also qualified this rule, have been expressly repealed. Now, by this canon it was never doubted or disputed that the common law recognized representation among collaterals *ad infinitum*. And when an intestate left only female collateral heirs, as one aunt, three daughters of a deceased aunt, and one daughter, and five granddaughters by the same deceased mother, of a third deceased aunt, that all these would inherit together; each set of children taking, by representation, the share of its deceased parent.

The question here is, has this rule been changed by the legislation in New Jersey? There is no express enactment changing or limiting the rule of representation among collaterals. In the statute of distributions, it is expressly enacted that no representation shall be admitted among

collaterals, after brothers' and sisters' children. There was, perhaps, no necessity for it there, as by the practice of the ecclesiastical courts, and by the Civil law, which those courts had adopted, there was no representation admitted, but by brothers' and sisters' children, among collaterals. But for greater precaution, either because the words next of kindred might include all representatives, as these were provided for in case of lineal kindred, or because the well established rule of representation *ad infinitum* among collaterals as to inheritance, might be held to attach, representation was expressly limited in that act. And the omission of this limitation in the part of the subsequent statute of descents, which relates to the same subject, would indicate that it was not intended to adopt it there.

Nor is there anything in the act of descents, or in the past legislation of the state on that subject, which shows an intention to abolish the common law doctrine of representation among collaterals. On the contrary, every act in the whole legislation of the state, has shown an intention, carefully and minutely declared, to provide for representation among collaterals, as well as lineal descendants, wherever they are mentioned. In case of brothers and sisters of the whole blood or half blood, it provides that in case they, or any of their children, shall have died, their children, respectively, shall take their share; a provision which the courts will continue, by construction, to the most remote issue. For, by the statute, neither father nor mother, nor collateral of equal degree, can take, as long as there is *any issue* of a brother or sister of either whole or half blood. And the doctrine of primogeniture would not be revived to fill the hiatus.

The fact that none of the acts regulating descents, or to reform the provisions of the common laws, contain any provision like that of the statute of distributions, that no representation should take place after brothers' and sisters' children, shows that there was no intention to abolish representation. The provision in the statute of distributions, so familiar to

any lawyer who took part in drafting the acts relating to descent, would have suggested it, if such was the intention. The Civil law, with regard to succession, is founded on the 118th Novel of Justinian, as amended by the 126th Novel. In Novel 118, we find the provision limiting representation to brothers' and sisters' children, in nearly the same words as used in the statute of distributions. It was introduced there to limit the doctrine of representation, which was adopted in other parts of the same Novel, and had been the rule of the old Roman laws, as contained in the Digest, as it was the rule of the common law. And although the statute of distributions is not copied from the 118th Novel, but in many, if not most, of its provisions is radically different, yet there was the same reason for introducing the limitation in the statute as there was in the Novel—that is, that the common law, like the Roman law, always recognized representation. These facts make the omission in the statute of descents significant.

Representation among all of the blood of the ancestor, has been a favorable doctrine among the legislators and the people of this state. The legislature have shown this, not. only by their positive provisions, but by using, in this section, the word consanguinity instead of kindred, as in the statute of distributions. This word refers to the bond of *blood,* by which the common law transmits property, *common* blood coming from the same ancester; a word peculiarly appropriate to the common law mode of reckoning kindred, as distinguished from the canon or Civil law rules. By the doctrine of representation, the common law rule is always to count the degrees from the intestate to the common ancestor. Those who come from the nearest ancestor of the decedent, are united by the nearest common blood or consanguinity, as concerns or relates to him. And that one uncle of the deceased should take the whole inheritance, to the exclusion of the children of two other uncles who had died shortly before him, would strike as grossly unjust every citizen who had been trained to venerate the justice of

the system of the state in dividing property equally among all of the blood of the ancestor; and this would be the impression, even if the inheritance was not derived from a common ancestor.

The words "of equal degree" of consanguinity, cannot be held to exclude cousins from inheriting with uncles, as long as the common law rule of reckoning degrees is adhered to; *that* includes representation; and by that, cousins are in the same degree with uncles. The common law had this settled rule; and it was the rule adopted as to real estate and adhered to in England and in this country, long after the statute of distributions and the decisions adopting the Civil law computation under it. With this rule established as the common law rule for reckoning degrees in the subject of legislation, the legislature pass an act to regulate the descent of real estate, and mention, without further definition, degrees of consanguinity. It is impossible, by any rule of interpretation, to infer that any other meaning was intended to be given to these words, than the technical meaning given to them in the system of law, as to the particular subject in which they are used, and to which they relate. The word heirs, if used in a New Jersey statute, would mean heirs by its present laws, not heirs by the law of England or the Civil law, or any system of foreign law.

And the doctrine of the Supreme Court in the case of *Taylor* v. *Bray*, as to ascent, applied to this case, would clearly leave the common law rule to govern it. That case was much stronger than this; the grandmother was clearly of consanguinity to the decedent, and nearer than his collateral relations. She was the person designated by the words of the statute, and by them was entitled, by whatever rule consanguinity was reckoned, and without regard to the doctrine of representation; and yet it was held that although these words, in their literal meaning, would contravene the common law rule against ascent, yet, as there was no trace in the legislation of the state of any purpose to abolish the ancient law, these words should not have that effect.

From the history of the legislation of the state, it is obvious that the sixth section of the statute of descents, on which this question arises, was introduced only .for the purpose of abolishing male preference and primogeniture among collaterals, as they had before been abolished among lineal descendants, and descendants of brothers and sisters.

The first act in the legislation of the state on this subject after the Declaration of Independence, was that of May 24th, 1780. *Pamph. Laws* 81; *Pat. Laws* 43. This abolished entirely the right of primogeniture, and partially the preference of male stocks, by giving to male descendants, both lineal and collateral, as far as brothers and sisters and their issues, two shares to one for a female descendant. It also provided for inheritance by brothers and sisters of the half blood, without excepting those not of the blood of the ancestor. This act provides for lineal descendants in the first section, for brothers and sisters in the second section, and for brothers and sisters of the half blood in the third section. It carefully provides for representation among lineal descendants and issue of brothers and sisters of the whole blood in the first two sections; but does not provide this as to the half blood in the third section, which was evidently drawn by a less skillful hand; and by a blunder, not strange, perhaps, if we knew its draftsman, but which, it seems strange, could have been overlooked by those who had charge of this change of legislation, provides if a person should die seized intestate, and without leaving a brother or sister of the whole blood, or their issue, leaving a brother or sister of the half blood, that such half blood should inherit; and as it does not mention dying without issue, the half blood would, by the literal interpretation, take in preference to children, if there was no brother of the whole blood. This act does not provide for any collaterals beyond brothers of the half blood, and the issue of brothers of the whole blood, but left the common law rules, as to primogeniture and preference of male stocks, in full force as to uncles, cousins,

and all more distant collaterals, and left nephews of the half blood under the ban of the common law.

The next step taken was by the act of February 5th, 1816, (*Pamph. Laws* 7,) which was intended to abolish the rules of primogeniture and male preference entirely, and to give male and female heirs equal shares, whatever the common degree of lineal or collateral relationship might be.   It provided this by general words.   It enacted that the real estate of any person who should " die intestate leaving *two or more heirs* lawfully entitled to the same, should descend to, and be inherited by, his or her said heirs, whether male or female, lineal or collateral, in equal shares or portions." This act left the law as it was, so far as it declared who were heirs, but enacted that all who were heirs by the law as it then was, should inherit in equal shares, whether male or female.

Next follows the act of February 15th, 1816, (*Pamph. Laws* 26,) amending the third section of the act of 1780, relating to half blood, by inserting the words " lawful issue or" between the words " without" and " any brother," &c., and by adding a clause excluding those not of the blood of the ancestor, from whom the property came to the intestate; but it did not provide for representation.   Before this, the Supreme Court, in *Den* v. *Urison,* 1 *Penn.* 212, and *Den* v. *De Hart,* 2 *Penn.* 481, had held that the provision for brothers of the half blood, must be taken as subject to the general rule of the common law in other collateral descents where the intestate had inherited the land from an ancestor, that he must be of the blood of the ancestor. But the Court of Appeals, in *Arnold* v. *Den d Phœnix,* 2 *South.* 865, over-ruled these cases, evidently to arrive at an equitable result, according to their spirit, but against the letter, and the decision so made was followed in *Den* v. *McKnight,* 6 *Halst.* 385.

Next follows the act of January 29th, 1817, (*Pamph. Laws* 8, *Rev. Laws* 608,) of which the seven enacting sections are the same in effect, and almost in words, as the first seven

sections of the act of 1846, now in force, except that in the last is added a provision that in a certain case a mother may inherit for life. It is to be remarked that while the act of 1780 provides for representation of children and brothers and sisters dying in the lifetime of the ancestor, by the word "issue," so as to include all their descendants to the remotest degree, the acts of 1817 and 1846 change this language, and provide that if a brother or sister should have died leaving a child or children, such child or children should inherit the share of his father or mother, and the same law of inheritance should be observed in case of the death of any child of a brother or sister, before the person dying seized. There is no direct provision for representation further than children of nephews. That depends upon the implication to be derived from the language of the sixth section, which only provides for collaterals of equal degree of consanguinity, upon failure of "issue" of brothers and sisters. The first section of the act of 1780, relating to lineal representation, is also changed in language in the acts of 1817 and 1846, but so as to include all lineal descendants to the remotest degree. These acts also provide for representation by children and grandchildren of brothers and sisters of the half blood, in the same manner as of those of the whole blood, and change the previous act in that respect. Here we see a careful provision in all legislation, both as to lineal and collateral heirs, for representation according to the canons of the common law, extending even to the half blood, when of the blood of the ancestor, and when omitted by inadvertence, provided for in the subsequent legislation.

In the sixth section of the act of 1817, the descent to collaterals beyond the issue of brothers and sisters, is provided for. It was intended to supply the provision of the act of February 5th, 1816, thereby repealed, and to correct the evident defects in the language of that act. The object in both cases, was simply to abolish primogeniture and male preference in all cases, as had been done before, among lineal descendants, and brothers and sisters, and their issue,

except that males had two shares. The language of the act of 1816, clearly, simply, and fully effects the purpose; it showed no design, and could not be interpreted to change or limit the common law doctrine of representation; its defect was, that it provided only for such persons as were then, by law, the "lawful heirs" of the intestate. A female cousin was not then a lawful heir, if she had a brother living; the act was no doubt intended to include that very case, and would now be construed to include it in a case of descent while it was in force. Yet it was better to change the language so as to include it expressly, and not by construction only. The section does not provide that the several persons in equal degree, shall be those in the nearest degree. That was provided for by the common law rule, which it did not intend to interfere with, but only to provide that when there were several in that nearest degree, according to the common law rule, they should inherit equally.

The general intent of all the legislation was to preserve the doctrine of representation among collaterals as well as lineals, and in no case is there any positive attempt to change or abrogate it.

The doctrine of the common law as to representation among collaterals must therefore be held, like the rule as to ascent, not to be affected by the provisions of this sixth section.

The consequences supposed to flow by the words of this act, it is said, must prevent permitting such representation. It is assumed that if cousins are held to be in the same degree as uncles, six children of a deceased uncle would inherit with a surviving uncle *per capita*, each one-seventh. But this difficulty should not change the construction of the language, settled by other cases in precisely the same situation, and according to the established rules of construction. It should be avoided by giving to the provision itself that meaning which was evidently intended. The words "shall descend and go to the said persons of equal degree of consanguinity, as tenants in common in equal parts," should be

construed by holding that the words "in equal parts" refer to a division per stirpes, and not per capita; a division in the manner in which the common law would divide it among female heirs or others taking in equal shares. The words of the section, if taken literally, and without regard to the evident object of the legislation, would warrant a division per capita. But these or like words in legislation on kindred subjects, have always received the interpretation contended for. The statute of distributions, 22d and 23d Car. 2, ch. 10, directs the distribution of "the residue by equal portions to, and amongst the children of, such persons dying intestate, and such persons as legally represent such children, in case any of said children be then dead;" "and in case there be no children, the residue to be distributed equally to every of the next of kindred of the intestate, who are in equal degree, and those who represent them;" provided there be no representation among collaterals, after brothers and sisters children. This has been re-enacted in this state in the same words, and still continues to be the law of this state. If literally construed, a distribution by "equal portions," or "equally" to children or to next of kin, and those who represent any such as should have died, must be per capita, and the six grandchildren of a deceased daughter would each take an equal share with a surviving son, and the children of a deceased brother would take equally with the surviving brothers and sisters. Such construction has no where ever been given to these acts, but the equal portions and equal divisions, have been held to be equally per stirpes, and not per capita.

All the acts regarding descent, have been and must be by common consent, construed according to their evident intention, and not according to the literal import of the words. The act of 1817, as now in force, according to its literal interpretation, does not abolish primogeniture or male preference, where an only child has died before his father, leaving children. The oldest son, on the death of the grandfather intestate, would take the whole. The act only provides for

the case of an ancestor leaving two or more children. If he leaves one child, it would take by the common law. Then it provides that if any child shall have died, the share which such child would have been entitled to "under this act," shall descend to his issue equally. The provision of the act of 1780, was substantially the same. Yet no one would contend that in such case the oldest son of such only child inherited the whole, to the exclusion of his brothers; such doctrine would overturn titles as accepted for ninety years past. The manifest intent of the legislation must control the construction. So evident was this, that these words have been continued in the revisions of 1799, 1820, and 1846, although Mr. Griffith, in his Register, Vol. 4, p. 1250, called attention to them. The revisors, whose duty it was to correct defects of expression, did not think it required any alteration.

Again: the third section of the act of 1780, which directs in terms, that brothers and sisters of the half blood shall inherit before children of lineal descendants of the person dying seized, never was or can be construed according to this literal meaning, but according to the intent only, to provide for cases where there were no lineal descendants, or brothers of the whole blood. And this interpretation could be only on the ground that the rule of preferring lineal descendants is so engrafted on our laws, and deeply rooted in the opinion of our people, that the intention to change it will not be inferred until legislation has so expressly declared. Representation among collaterals is just as much cherished in our legislation, and the right of cousins to inherit with uncles is just as much impressed upon the minds of the community as a matter of equity and justice, as the preference of descendants to the half blood. In most cases the injustice would not seem so glaring, but if an orphan minor should die at twenty in the family of an aunt, where she had been brought up, and the children of that aunt, who had been as brothers and sisters, should be excluded from all share of her patrimony, because their mother had

died a few months before her, and the whole should go to an uncle comparatively a stranger, the injustice of the rule would strike the public in such manner as would produce legislative changes of this construction of the law.

The act of February 5th, 1816, by its literal construction, would give the estate to all lawful heirs in equal shares. At that time, the children of a deceased son, and also of such deceased son's deceased grandchild were heirs, yet these would never have been held to take equally with a son *per capita*, but only *per stirpes;* the equality intended, if not expressed.

Such being the rule by which the term " in equal parts," in this section, must be construed, the difficulty assumed to arise from the consequences vanishes. And a construction by which the section is held to direct the descent to those in equal degree of consanguinity, according to the rules of the common law, including the doctrine of representation in equal parts, equal *per stirpes,* in case of representation, would be in harmony with the rules of construction in other cases, and give effect to the undisputed intent of the legislature.

If the Civil law rule for reckoning collateral degrees has been adopted as the law of this state, for computing degrees of consanguinity under the sixth section of the act of descents, that would put the question at rest, and render useless the reasoning to show that it is not the *proper* rule.

It has not been adopted by legislation, nor by any decision of our courts. It is said that the general opinion of the profession is in favor of it. The fact may be so ; but many of the profession with whom for years I have conferred on this subject, have viewed it as unsettled, and some of no mean eminence have contended that it was not the correct rule. The report of the master in this case, a lawyer of eminence, of long experience and extended practice, to whom the office of Chief Justice was tendered near twenty years ago, shows that the profession are not unanimous in their opinion. Opinions formed, or rather acqui-

esced in, from the fact that the rule of the Civil law had been applied to the statute of distributions, should not have much weight. And the opinion of the profession, and of legislators evinced by the statutes, and that of the public, has been held not to change the common law. Until the first decision in *Gough* v. *Bell*, it was the general impression of the bar, of conveyancers, of legislators, and I had almost said of the bench, that the owner of lands along the shore had title to low water mark. Yet this was held not to affect the rule of law, and it was decided that the state owned the soil to high water line, subject to certain rights and easements of the land owner.

The only authority I find for this position is a quasi dictum of Chancellor Kent, who says, 4 *Com.* 412, that in computing the degrees of consanguinity, the Civil law is *generally followed* in this country. He merely states the fact, but refers to no cases or authorities in which it has been so decided or held; I am unable to find a single case in which it has been so held, where the statute of the state has not adopted that rule, or one like it. The case nearest to it is one in the Supreme Court of Connecticut, *Hillhouse* v. *Chester*, 3 *Day* 166. The statute of Connecticut under which that case arose, gave "the residue both of the real and personal estate, equally, to every the next of kin of the intestate in equal degree, and those who legally represent them." Previous statutes and recitals in their preambles, showed that in Connecticut, real estate had generally been administered and divided among the heirs, in common with the chattels or movable estate, and that the lands of a woman, upon marriage, passed to her husband, and were disposed of by him, like her personal estate. And in the legislation of the state, land had been treated as of small value as compared with personal estate. On these considerations, and because the words "next of kin" were used, as applied to personal property, together with land, and were taken from the English statute of distributions, under which they had received a settled meaning, the court held the same meaning

must be given to those words as in the statute of distributions, and applied to lands in the same sense as to chattels, with which they were connected in the same sentence. In the New Jersey statute of descents, the words of the statute of distributions are not used, and the other reasons on which that decision is based, do not exist in this state.

The Civil law rule of reckoning degrees of kindred, has been adopted both by the English courts and in this state, in giving effect to the statute of distributions. This was so held by Sir Jos. Jekyll, Master of the Rolls in 1722, in *Mentley* v. *Petty, Finch's Prec.* 593; by Lord Hardwicke, in 1749, in *Thomas* v. *Ketteriche,* 1 *Ves.* 333; and by Sir John Strange, in 1750, in *Lloyd* v. *Tench,* 2 · *Ves.* 213; and has been ever since acquiesced in. In the construction of that statute, the courts have always regarded the fact that it was for the purpose of regulating a matter which was the proper subject of the jurisdiction of the ecclesiastical courts, which proceeded in matters of property according to the rules of the Civil law. That statute as stated by Holt, C. J., in *Pett* v. *Pett,* 1 *Lord Raym.* 571, and 1 *P. W.* 25, was drawn up by Sir Walter Walker, an eminent civilian. He had applied without success to the common law courts, to compel the ecclesiastical courts to make distribution. These last mentioned courts originally held that the ordinary being entitled to the administration, could retain the surplus. But after the Reformation, it was the practice of the ordinary in granting administration, to require of the administrator, either a bond that he would distribute the surplus in the manner the ordinary directed, or that he should pay in advance certain portions to such persons. But after the statute of Edward III, directed that the ordinary should grant administration to the *best friend* of the intestate, he could exact no such conditions, and it was held that neither the ecclesiastical or civil courts could compel distribution. This was the occasion of the statute. Hence, in construing it, the courts regarded the rules of the Civil law, and of the ecclesiastical courts, as the proper rule for the construction

of it. And Chief Justice North, in his learned and elaborate opinion in 1681, in *Carter* v. *Cawley*, published in *Sir T. Raym. R.* 496, refers to the rules of the Civil law as acknowledged in the ecclesiastical courts for the construction of that act, and states that he had consulted Sir Leoline Jenkins, Judge of the Prerogative Court, and Sir Robert Wiseman, Dean of the Arches, as to the rule in those courts; and adds at the end of his opinion a certificate on the same subject, procured from five learned doctors of the Civil law. This opinion of Chief Justice North, was on the question whether the representation allowed in the act to brothers' and sisters' children, must be confined to the children of brothers and sisters of the intestate, or should extend to those of the brothers and sisters of any surviving next of kin; and although not concurred in by the court at that time, there being no decision, was afterwards in a series of cases adopted as the rule of construction. Lord Commissioner Hutchins in *Beeton* v. *Darkin,* 2 *Vern.* 168, doubted; and Holt, C. J., in *Blackborough* v. *Davis,* 1 *P. W.* 41, was much inclined to adopt the rules of the common law, before the changes as to primogeniture and preference of males and the prohibition of ascent in time of Henry I., as still the law by which the statute of distribution, was to be construed; the alteration not having extended to personal estate. He says: "The laws of England, and not any foreign laws ought to govern this case." And he concludes that if the case was controlled by the Civil law, it was by that law as known in 1100, the time of Henry I, and not by the laws of Justinian, which were not discovered until 1125, and had for centuries been everywhere disused. But the rule laid down by Chief Justice North, was adhered to and adopted in *Maw* v. *Harding,* 1791, 2 *Vern.* 233; in *Walsh* v. *Walsh, Finch's Prec.* 54, decided in 1695; in 1700, by the King's Bench on application for mandamus in Pett's case, 1 *P. W.* 25; *Holt R.* 259; 1 *Salk.* 250; 1 *Lord Raym.* 571; and in 1719, by Lord Chancellor Parker, in *Bowers* v. *Littlewood,* 1 *P. W.* 593.

If the courts in construing the statute of distributions, thus felt constrained to adopt the rule of the Civil law, because that was the law by which such matters had been determined, and the law of the ecclesiastical courts, which before had, and still retained that jurisdiction, and because the act had been drawn and procured by an eminent civilian, who probably used the term, "next of kindred," in the sense established in that law; the same reasoning should make them adopt the common law rule, in interpreting a statute, concerning the descent of real estate; a matter which had always been governed by the rules of the common law, and had been held, most peculiarly, subject to these rules, and exclusively under the jurisdiction of the courts of law. There is hardly any case, in which the Civil law has been referred to in such matters; none in which it has been taken as the guide.

Nor is this matter affected by the consideration, that the act of descents having used the same term which had been used in the statute of distributions, the meaning of which had been settled at law, it should have the same meaning here. It is not the same term; "next of kindred," and of "equal degree of consanguinity," are radically different. The latter peculiarly applies to the descent of real estate; by its very structure, referring to the common ancestor, through whose blood the estate is supposed to come, and is most appropriately used to express the common law rule, which calculated only the degrees of the intestate from the common ancestor, and held all from his blood in the same degree. Besides, the same word is often used in different meanings in different statutes, when as here, it is applied to a different subject matter. And here, there is not the necessity, as in the statute of Connecticut, to apply one or the other of these meanings to both subject matters, because they were connected in the same sentence.

This is the situation of the case: Law judges of the highest authority, have intimated opinions different from the view taken by me of the question in the cause; and

my own opinion is settled in such way, that it can only yield to a determination by the courts of law, to whom this question, and every question as to the descent of real estate, properly belongs. It is, therefore, right that I should not determine the cause, without sending the question to the Supreme Court, for their opinion to be certified upon it. But the matter involved is less than $400, and unnecessary costs should be avoided. Such a question may, and probably will eventually, be taken to the Court of Appeals for settlement there, and as it can be settled there with little more delay or expense than in the Supreme Court, I will decide the cause here upon my own view of the case, and overrule the exceptions.